(C. D. 1469)

R. J. Saunders Co., Inc. *v.* United States

United States Customs Court, First Division

(Decided October 21, 1952)

*Siegel, Mandell & Davidson* (*Sidney Mandell* of counsel) for the plaintiff.
*Charles J. Wagner,* Acting Assistant Attorney General (*Joseph E. Weil,* special attorney), for the defendant.
*Lamb & Lerch* (*David A. Golden* of counsel) as *amicus curiae.*

Before Oliver and Mollison, Judges; Mollison, J., concurring

Oliver, Chief Judge: The merchandise involved in this case is described on the invoice as "954 kilos Edge sponges," which the collector classified as manufactures of compounds of cellulose under paragraph 31 (b) (2) of the Tariff Act of 1930, which, so far as pertinent, reads as follows:

Par. 31. * * *

\* \* \* \* \* \* \*

(b) All compounds of cellulose (except cellulose acetate, but including pyroxylin and other cellulose esters and ethers), and all compounds, combinations, or mixtures of which any such compound is the component material of chief value:

    *      *      *      *      *      *      *

    (2) made into finished or partly finished articles of which any of the foregoing is the component material of chief value, not specially provided for, 60 per centum ad valorem.

Plaintiff claims that the merchandise is classifiable by similitude, paragraph 1559, Tariff Act of 1930, under either of the following provisions in paragraph 1545, Tariff Act of 1930:

* * * all other sponges, not specially provided for, 15 per centum ad valorem; manufactures of sponges, or of which sponge is the component material of chief value, not specially provided for, 25 per centum ad valorem.

By valid amendment to the protest, claim is made for duty assessment at the rate of 7½ per centum ad valorem under paragraph 1545 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade (82 Treas. Dec. 305, T. D. 51802). Such claim can receive no consideration since the entry in question was made prior to the effective date of the General Agreement on Tariffs and Trade. Although alternative claim is made for classification as waste, not specially provided for, at 7½ per centum ad valorem under paragraph 1555, Tariff Act of 1930, as modified by the trade agreements with Canada, the United Kingdom, and Mexico, T. D. 49752, T. D. 49753, and T. D. 50797, respectively, this claim was not pressed at the time of trial nor argued in counsel's brief. Hence, no further reference will be made thereto. The claim for classification by similitude as rubber of the kind provided for in paragraph 1537 (b), Tariff Act of 1930, has been abandoned.

The process of manufacture for the commodity in question was stipulated by counsel for the respective parties and is set forth in the record as follows (pp. 6–8):

Raw cotton linters or wood pulp is purified and calendered into mercerized sheets. These sheets are treated in a steeping press with a solution of caustic soda to form alkali cellulose. This alkali cellulose, still in sheet form, is put into a shredder which tears the mercerized sheets apart to form a shredded mass.

The alkali cellulose is then treated with carbon disulphite in a baratte or churn to form sodium cellulose xanthate. This xanthate is thereafter dissolved in mixing machines in a caustic solution to produce viscose.

In a large kneading machine, to this viscose solution is added Glauber's salt crystals in one or more controlled sizes depending upon the desired porosity of the finished cellulose sponge. Hemp roving, cut to short (½″) length is fluffed and added.

This mass is thoroughly mixed and kneaded whereafter it is transferred to block molds of the desired shape, preferably by the use of an extrusion machine.

The molds containing the sponge mix are then subjected to heat which performs a multiple function, melting the Glauber's salt crystals, coagulating the

viscose and transforming it and regenerating the cellulose, thereby forming the voids in the mass which become the pores in the cellulose sponge.

The resultant sponge block regenerated cellulose still impregnated with Glauber's salt solution, is now washed to free it of salt and thereafter treated with weak acid to remove the chemical by-products of the reaction that remain in the cellulose sponge block.

After a further water-wash to remove traces of acid, the sponge block is impregnated with an aqueous solution of glycerine or other suitable softener to inhibit abnormal shrinkage during drying. After the surplus softener solution has been removed with squeeze rolls or a centrifuge, the blocks are submitted to a controlled drying process which is necessary to produce a uniform block.

The merchandise before the Court represents the cuttings from the blocks.

Examination of the samples (collective exhibit 1) discloses that these so-called cuttings are pieces of the imported product, ranging in thickness from approximately ⅜″ to 1″, and, for the most part, rectangular in shape, ranging in sizes from approximately 2″ x 3″ to 3″ x 4″.

Four witnesses testified on behalf of plaintiff. Ridgely G. Shepherd, Jr., a qualified chemist associated with the United States Testing Co., subjected samples of the imported merchandise, collective exhibit 1, to several chemical analyses. From the complete series of tests as made, the witness concluded that the imported product was comprised substantially (approximately 94 per centum) of regenerated cellulose with fibers of a cellulosic nature (approximately 6 per centum) admixed therein. He defined "regenerated cellulose" as "cellulose which has been formed by the decomposition of a cellulose derivative," and based his conclusion that the merchandise in question consisted substantially of such substance upon "the physical appearance of the sponge" (R. 34). No determination was made as to the identity of the cellulosic material comprising the fibers. No test was made to determine the presence of hemp rovings or coloring matter.

The witness further testified that the present merchandise is neither a compound of cellulose nor a combination or mixture which is in any part a compound of cellulose, although the constituents, i. e., regenerated cellulose and fibrous matter, are, of themselves, compounds which, as they exist in the imported product, are a mixture of cellulose. He clarified this conclusion by stating that he referred to the terms "compound," "combination," and "mixture" in their chemical sense and not according to the common or ordinary meaning of the words.

The following definitions of the word "compound," taken from the "Century Dictionary and Encyclopaedia," were read to the witness (R. 26):

*a.* and *n.* **II.** *n.* **1.** Something produced by combining two or more ingredients, parts, or elements; a combination of parts or principles forming a whole.

*v.* **1.** *trans.* **3.** To form by uniting or mixing two or more elements or materials.

**4.** To make; constitute; form; establish.

The witness "couldn't say" that the merchandise in question is a compound within the quoted common meaning of the word.

He was also interrogated as to the definition of "compound," as set forth in Webster's New International Dictionary (Second Edition), as follows (R. 27):

**2.** To form or make up, as a composite product, by combining different elements, ingredients, or parts; as, to *compound* a medicine. * * *

**1.** **a** Composed of, or produced by the union of, several elements, ingredients, parts, or things. **b** Involving combination; composite. * * *

**1.** **a** That which is compounded, or formed by the union or mixture of elements, ingredients, or parts; a compound substance.

The witness stated "* * * there are certain parts of that definition which you gave which I could agree to because it is the way I use it. There are other parts that I wouldn't want to say specifically. When you said that a compound is a union of two or more elements in that case I could agree. I wouldn't want to offer an opinion on the rest of it." It is clear from the witness' answer, just quoted, that he adhered to his limited understanding, in a chemical sense, of the term "compound," and did not recognize the broader phases of the word included within the common or ordinary meaning thereof. His personal understanding of a "compound of cellulose" is "material or substances which could be decomposed into cellulose in one or more materials" (R. 31).

Plaintiff's second witness was Dr. Henry Mouquin, professor of chemistry at New York University since 1929, who had industrial experience which included research in connection with cellulose products, particularly sponges. Based upon a physical examination of the merchandise in question (collective exhibit 1), the witness identified the product as almost typical of the cellulose sponge, containing regenerated cellulose fibers that are essentially a cellulose, a minute quantity of dyestuff, and "a small amount, of microscopic [*sic*] [hydroscopic] material, to keep it moist" (R. 40) and further stated, corroborating the previous witness' testimony, that the commodity under consideration is not a compound of cellulose nor a combination or mixture which is in any part a compound of cellulose. He defined a cellulose as "carbohydrate and more or less a pure compound found in nature," (R. 42) of which the exact constituent is not known. In the natural state, it contains approximately 78 per centum cellulose and, when bleached and cleaned, it is practically pure. The use of hemp "would have a tendency to clean and bleach in order not to convey color to the sponge itself" (R. 43). The purpose and effect of glycerine as a softener in the present merchandise were explained by the witness as follows (R. 43):

The softener is put in there in order to maintain the moisture content in the mass of the sponge. In so doing it prevents the cellulose from shrinking and hence maintains the uniform shape of the sponge.

The softener is a moistening agent that is put on the surface of the sponge and "as soon as you use it once, that softener is gone" (R. 44). The distinction between "regenerated cellulose" and "cellulose" was explained in this way (R. 45):

It is largely a matter of structure I believe that has been applied by these X-ray considerations. The natural cellulose that appears in nature has certain regularities in its structure which is almost crystalline in nature. On the other hand, regenerated cellulose in general does not have that. It can be made to look almost like natural cellulose by various devices which tend to create structure in it, but in the case of a sponge where no such strain has been put on it, you will see there signs of cellulose molecules in such a mass. Whereas you have the fibers themselves you might be able to show a structure of semi-crystal matter. So regenerated cellulose is essentially one without a regular structure (R. 45).

The merchandise in question was characterized as being "synthetic in part," which the witness described as follows:

The fibers are not synthetic. They are natural fibers, but the matrix which hold the fibers could be called synthetic because it has been regenerated from a pure compound found in nature. This is not found in nature as such (R. 46, 47).

The witness' testimony concerning dictionary definitions of "compound," as hereinabove set forth, is substantially the same as that of the previous witness along the same line. He did not agree with those definitions in their entirety, the reason therefor being that he uses the word "compound" as a chemist.

On redirect examination, the witness testified that his experience with cellulose sponges was confined to experimental manufacture on a small scale and observing "them produced on a fairly large scale" on only two occasions, at which times he did not see the entire process, particularly where the softener is added.

Two other witnesses were called by the plaintiff, both of whom were engaged in the sponge business over a long period of years. They testified concerning comparability of the merchandise in question with natural sponges. Their combined statements show that in quality, texture, and absorbency, the product under consideration is similar to the "Cuban or Nassau reef" and the "hard head reef" natural sponges. In usage, the present merchandise, like natural sponges, serves various purposes in different industries. Particular mention was made of use in the pottery, hat-making, and watch-making industries, as well as for bath purposes and "for leg make-up" and in "impregnated cake powder."

Defendant's sole witness was Max V. Noble, a well-qualified chemist, associated, since 1941, with the Du Pont Co. as technical superintendent of the cellulose sponge section in charge of research development work on cellulose sponges. He conducted a series of tests on the im-

ported product (exhibit 3–A) for the purpose of determining the nature and quantities of the ingredients and the purposes each served. From these tests, the witness determined that the imported merchandise contained cellulose. He also found hemp to be present and that a quantity of glycerol had been added as a softener to make the finished product more "pliable or flexible."

Coloring matter was added to give the merchandise eye appeal. Without it, the material "would have a dirty gray appearance, like unbleached cardboard."

In direct contradiction of plaintiff's witnesses, this witness testified that the present merchandise is a compound of cellulose, within the common meaning of the term "compound," and supported his conclusion as follows:

> The definitions are different from the normal chemical definition of compound in that they include mixtures made with a purpose and intent to change the property of the product and they would include, I would say, physical mixtures as well as the chemical mixtures. While as a chemist if asked for a definition of compound it would be a material obtained as a result of chemical interaction to two substances, so it boils down in my estimation to a matter of the definition one intends to use. For example, in this product here which contains hemp which cannot be separated out easily at least, in its original form, it contains glycerol in there for a specific purpose, although it can be washed out, and it contains coloring matter which is part of the material (R. 86).

On cross-examination, the witness testified that no chemical reaction occurs among the ingredients during the process of manufacture of the product in question, so no chemical compound exists; "nevertheless, the fiber is bound into that structure by physical attraction between the cellulose and the fiber, so it could be called a compound quite correctly." The witness characterized the entire mixture or combination of the ingredients, i. e., cellulose, softener, and coloring matter, as a physical compound.

On the basis of this record, plaintiff, as stated in counsel's brief, "relies upon the principle laid down by the United States Court of Customs and Patent Appeals in the *United States* v. *Olivier Straw Goods Corp.*, 19 C. C. P. A. 71, T. D. 44898." In that case, the merchandise consisted of ladies' hat braids composed chiefly of cellulosic material with traces of sulphur and water. The presence of sulphur in those hat braids is explained in the following excerpt from the court's decision:

> The evidence, we think, shows quite clearly that the purpose of using carbon bisulphide from which the sulphur in the finished product comes, is primarily and solely to perform a certain chemical function upon the elements of the raw material so as to produce viscose or visca, and it is not inserted for the purpose of producing either a chemical compound *or a compound in the common understanding of that term.* [Italics supplied.]

After production of the viscose, "Whatever sulphur remained was left, not to perform a function in the finished article but, largely,

because it was commercially impractical to remove it." The court held that the merchandise was not "such a compound as Congress contemplated by the language of paragraph 31 of the Tariff Act of 1922."

The present case is clearly distinguishable from the *Olivier Straw Goods Corp.* case, *supra*. Here, it is definitely established by the stipulated facts, coupled with defendant's testimony, that the glycerine was intentionally added during the process of manufacture of the present merchandise "to inhibit abnormal shrinkage during drying," and that the use thereof makes the commodity more pliable or flexible. This factual finding is not disturbed by the statement of plaintiff's witness that "as soon as you use it once, that softener is gone" (R. 44). It is fundamental that the imported condition of merchandise controls its tariff classification. *United States* v. *Citroen*, 223 U. S. 407; *Dwight* v. *Merritt*, 140 U. S. 213. Unlike the sulphur that remained in the merchandise involved in the *Olivier Straw Goods Corp.* case, *supra*, the glycerine used in the merchandise under consideration was intentionally added for a definite and specific commercial purpose.

In *Birn & Wachenheim (United States Impleaded)* v. *Du Pont Cellophane Co. (Inc.)*, 17 C. C. P. A. (Customs) 122, T. D. 43454, the merchandise consisted of thin, highly transparent cellulose sheets. The record showed that the principal raw material was pure cellulose in the form of wood pulp which, through a series of chemical processes, was reduced to cellulose xanthate, a chemical compound, that was dissolved into a viscous or semifluid mass, called viscose. Further processing restored the substance to the condition of cellulose. After coagulation, the film was subjected to purifying and bleaching baths and finally to a glycerine bath, which combined the cellulose hydrate with a quantity of glycerine necessary to give the finished sheet a quality of flexibility essential for commercial usage.

The important question in that case was the common meaning of a compound of cellulose in any of the forms prescribed in paragraph 31. In discussing this, the court said (pp. 125–126):

The difference between opposing counsel in this case seems to rest entirely upon the meaning of the word "compound," and both sides cite many definitions and authorities. The importers in arguments and briefs contend for a definition of the word "compound" which would exclude an admixture of a solid or solids with a liquid ingredient.

Of the many definitions cited for the word "compound" (and in each definition we find different shades of meaning) it is sufficient to quote the definition given in the Century Dictionary and Cyclopedia:

Compound, a. and n. II n. 1. Something produced by combining two or more ingredients, parts, or elements; a combination of parts or principles forming a whole.

211

Compound, v. 1. trans. 3. To form by uniting or mixing two or more elements or materials.

4. To make; constitute; form; establish.

In *United States* v. *Stone & Downer Co.*, 175 Fed. 33, where "alcoholic compounds" were under consideration, the court held that a mixture of fine-cut herbs and alcohol was an alcoholic compound, although the alcohol merely served as a preservative in the importation of the leaves and was also used with leaves as a tincture. There the court said (p. 37):

> Of course, the word "compound," under some circumstances, has a limited application. Pharmacists ordinarily apply it to a mere mixing of different substances, especially when comminuted with the mortar and pestle. Chemists sometimes, although not ordinarily, use it when two substances are chemically united so as to make a new substance; but, according to the lexicographers, and according to well-known understanding, it covers any "union or mixture of elements, ingredients, or parts." Webster's International Dictionary (1904), the word "compound."

To the same effect is the case of *Smith* v. *Rheinstrom*, 65 Fed. 984, and the case of *Mackie* v. *Erhardt*, 77 Fed. 610.

In *Monticelli Bros. et al.* v. *United States*, 8 Ct. Cust. Appls. 21, T. D. 37162, where "medicinal compounds" were under consideration, this court, at page 24, said:

> This involves the primary inquiry as to what may be articles similar to compounds or combinations. The citation of authorities is unnecessary to satisfy the mind that a compound or combination in the general understanding is necessarily something composed of more than one component material. The words themselves imply that requirement, because a compound or combination is a thing which results from the act of compounding or combining, and that obviously is the putting together or mixing in some manner of the materials requisite therefor.

Adopting the meaning of the word "compound," as set forth in the dictionary quotations, the court there held the merchandise to be a compound of cellulose and, in reaching that conclusion, said (p. 126):

> In our view it makes no difference by what process the compounding was brought about or at what time it took place, if, in fact, the product is the intentional result of the admixture of more than one ingredient which gave the material its essential characteristics.

Following the reasoning of the court in the *Birn & Wachenheim* case, *supra*, we find the merchandise in the present case to be a compound of cellulose, made into finished or partly finished articles, and as such hold it to be properly dutiable at the rate of 60 per centum ad valorem under the provisions of paragraph 31 (b) (2), as assessed by the collector.

Since the merchandise is provided for in said paragraph 31 (b) (2), plaintiff's claim for classification as sponges, by similitude under paragraph 1559, *supra*, becomes untenable. The principle of similitude can be invoked only for nonenumerated articles. *United States* v. *Stouffer Co.*, 3 Ct. Cust. Appls. 67, T. D. 32351.

Our conclusion, as hereinabove developed, makes it unnecessary to discuss other questions presented in the briefs of counsel for the respective parties and *amicus curiae.*

The protest is overruled and the decision of the collector is affirmed. Judgment will be rendered accordingly.

### CONCURRING OPINION

MOLLISON, Judge: I concur in the conclusion and reasoning of my colleague, and believe that a further reason exists for classifying the merchandise at bar, edge cuttings from synthetic sponge blocks, under the provisions of paragraph 31 (b) (2) of the Tariff Act of 1930.

If it be considered, as seems to be the defendant's position and the holding of my colleague, that the impregnation of the sponge block with glycerine created the compound of cellulose (and that up to that stage no compound of cellulose existed), then the act which created the compound of cellulose also made it into the article, to wit, a synthetic sponge, which determines its classification under paragraph 31 (b) (2), *supra.* It should be noted that the provision in paragraph 31 (b) (2) is not for articles *made from* compounds of cellulose, which would require the preexistence of the compound of cellulose as a material (*Cohn & Lewis* v. *United States,* 25 C. C. P. A. (Customs) 220, T. D. 49335), but is for compounds of cellulose, *made into* articles.

It seems to me, however, that the compound of cellulose was created at an earlier stage, namely, when the hemp rovings were united with the viscose solution in the treatment of the so-called "sponge mix." In my view, even though both the viscose solution and the hemp rovings are characterized as cellulose, one regenerated and the other natural, their union created a compound of cellulose within the meaning of the term as used in paragraph 31 (b), that is to say, the combination of viscose, or regenerated cellulose, with hemp, or natural cellulose, in order to achieve the different benefits of both types of cellulose in the resultant product, formed a compound of cellulose within the contemplation of the statute. The subsequent processes of molding, etc., made that compound into an article, a synthetic sponge.